a little bit of a hybrid argument session today because of some COVID related issues. We have a couple of lawyers appearing by phone. And so the first two cases today are like that with one attorney per side appearing by phone. And then the last two are all in person arguments. So hopefully we won't have any technological issues. Anthony is here to make sure that we get by. But if we do, just bear with us. We'll just fix everything and keep going. You know the lighting system. When the light hits yellow, that means that your time is drawing to a close. So begin to wrap up. If we take you beyond the light, then don't worry about it. You're on our time and not yours. And with that, we will begin with the United States v. Duldulao and Santos, case number 20-13973. And who's going first, Mr. Weisbrod or Mr. Burns? Mr. Weisbrod. Good morning, Your Honor. Mr. Weisbrod, good morning. May it please the Court, Co-Counsel, Government Counsel, I am David Weisbrod and I represent Appellate Kendrick Duldulao. We've raised one issue for the Court's consideration. It involves the sufficiency of the evidence as it pertains to the one count of conviction, which was a conspiracy to dispense controlled substances. Dr. Duldulao, being a doctor, it was the more specific alleged conspiracy that the prescriptions for the substances that he issued were not issued for a legitimate medical purpose or during the course of professional practice. And I think our primary contention, the summation of what we've tried to get across in our brief, is that we've all seen plenty of these doctor prescription cases in the past, in the last 10 to 15 years. And we think this one for Dr. Duldulao presents a unique circumstance due to four primary factors. Number one, there's no expert testimony regarding any of the prescriptions that Dr. Duldulao issued that say that they weren't issued for a legitimate medical purpose or in the course of professional practice. Number two, he was not convicted on any of the substantive charges regarding the actual prescribing. Two of those three substantive charges were dismissed at Rule 29 time and one was found not guilty by the jury. Third, the testifying co-conspirator... Could you draw an inference from just the surrounding facts about the pre-signed prescriptions and the length of time people came and the evidence that they were obviously addicted? Could you draw any inferences from that, that prescribing the drugs would be against sound medical practice? We think not on the basis of the record as a whole in this case. Again, because of the uniqueness of the case, we have video and audio recordings of two separate visits to Dr. Duldulao. One by a cooperating individual and one by an undercover agent. They're one month apart. In fact, in the undercover agent's visit, he goes and then has to come back because he has an older MRI which is unacceptable. He tries many times, several times, with Dr. Duldulao to convince him to go forward with this older MRI and is told not. You have three discrete video and audio recordings that contradict almost entirely this other plethora of circumstantial evidence, whether we want to call them red flags or otherwise. Again, in combination with the lack of any expert testimony regarding the specific issuance, the video and audio of how things actually occurred at the clinic, the lack of any testimony that, for instance, the pre-written prescriptions that Your Honor mentioned. Well, there was no evidence in this record that writing this prescription ahead of time, not signed by the doctor, mind you, but pre-writing a prescription does not violate any federal or state law. There's no regulation or policy. There was a lot of the DEA manual in this case. There was no indication that it violates any of those regulations. And so you take an activity, and the pre-written prescription is an example, that just effectuates a more efficient office. And the court, this district court, in its order denying the motion for judgment of acquittal, turns it into an inference of guilt. And what we've that's done with a lot of these so-called facts, but they're not in and of themselves evidence of guilt. There were a lot of facts about the medical office, what it looked like, the parking lot, and I don't see how those could be contradicted by the videos. In other words, there was testimony the plaintiffs looked sleepy, looked like they were on drugs, that I think one in five tested positive for illegal drug use, the patients traveled long distances, the parking lot showed evidence of drug abuse, things like that. Would you talk about those factors? Many of those are red flags that we've identified in some of our case law. Well, the fact is that the videos do contradict the notion that the parking lot was a mess. Matter of fact, when the agent walks in, you can see the parking lot, there's not people loitering. And the agent also testified that they had done previous surveillance at the lot. Of course, there's no video of that. So, I understand if I were arguing to the court and saying, well, because they didn't do video, that works in our favor. No, that's purely credibility determination as to whether to believe that statement. But two other videos demonstrate that there isn't chaos in the lot, when especially in the office proper, when both the confidential informant and the agent are waiting to be seen by Dr. Doddall. There are normal conversations with people in that office, people in the waiting room, the TV is on. There is this chaos that supposedly exists is not reflected in these hours long recordings. It is a normal, it appears to be just a normal, perhaps busy, but normal operating situation. But given conflicting evidence, we have to consider everything in favor of the government at this point, don't we? Well, I think the video and audio presents a different situation. And we've tried to suggest an analogy to the Scott v. Harris case, which was a civil matter, went all the way to the Supreme Court, where a motorist sued a law enforcement officer for excessive force in connection with forcing him off the road during a car chase. And the officer had filed a motion for summary judgment with the district court denied, said there was a genuine issue of material fact because the motorist says X, Y, and Z occurred. This court agreed with that. The Supreme Court in an 8-1 decision said, no, we have an unaltered video that tells us what the objective facts are. And they concluded that no rational jury, like what we would have in our review situation here, could find for the motorist. And therefore, on the facts of the record, the Supreme Court said, look at the video. And when the video offers this sort of objective, singularly accurate evidence of what actually occurred, we're to rely upon that. And we think that applies here because, again, it's not just one video showing a snapshot. It's, in essence, three visits because, again, the undercover agent went back twice. So we think there's some real importance to the video. I've commended it to the court in both of the briefs and would do so again at this time. And I see I'm over, so... Valerie. Can you give me the brief for Mr. Santos, please? Mr. Burns. Good morning, Your Honors. And may it please the Court, I'm Thomas Burns. And along with Shannon Reese, who recently joined my firm, we represent Dr. Santos. For decades, this Court, along with every sister circuit, has forbidden fact and expert witnesses from testifying about legal opinions. That's because interpreting the law is a court's job, not a jury's job. Dr. Chaytoff repeatedly violated that universal black letter prohibition. He repeatedly offered legal opinions about what federal and state statutes, regulations, and a DEA manual supposedly did or didn't mandate. And his opinions were often mistaken and sometimes absurdly so, especially with respect to handwriting and writing out Arabic numerals for prescriptions. He exacerbated that infirmity by unwittingly opining about Dr. Santos' subjective mental state, which is a violation of Rule 704B. And worst of all, this wasn't Dr. Chaytoff's first rodeo. He'd previously played fast and loose with the district court's in limine orders. All of these plain errors, along with preserved error, resulted in an unfair trial that affected Dr. Santos' substantial rights and impugned the tribunal's reputation. Now, before we jump into the four plain error standard, I'd like to just recap what Dr. Chaytoff did and how he was used in the trial. Before trial, he never disclosed the legal basis for his opinions in his reports. During opening statement and closing argument, the prosecutor emphasized this is what he's going to testify about these legal standards and it's based in the law. And then his testimony itself was riddled with inadmissible state of mind and legal opinions that usurp the rules of the judge. And Judge Pryor, it looks like you wanted to ask a question. No, okay. So he defined the legal phrases. And not only did he define the legal phrases, but he said, my opinion on these phrases is based in the law. So it's like the prosecutor says, what does this phrase mean? He says, this is what it means. And then the prosecutor asks the follow-up question, what are you getting that from? And he doesn't say it's industry custom and practice. He says, I'm getting this from the law. And that's impermissible. It's been impermissible for at least 60 years. The earliest case I found is Huff v. United States in the Fifth Circuit, which was a 1959 decision, saying that's not okay. Setting aside whether that's okay, wouldn't that be objective testimony rather than testimony about Dr. Santos' state of mind? So that's the two phrases. And my interpretation of the two phrases is legitimate medical purpose is a subjective standard, and usual course of professional practice is an objective standard. My argument about the legal interpretation applies to both phrases. So I'm saying, he's giving a legal interpretation of, you know, phrase one and phrase two, both of those are impermissible, and that's not okay. And then I'm additionally saying— But even if you're right, that legitimate medical purpose is a subjective inquiry, wasn't Dr. Chaytoff testifying that, in his opinion, the prescriptions weren't proper rather than what Dr. Santos intended by writing the prescriptions? Right. And so I'm drawing—there's like two steps to the reasoning. You're right that that's what he says. But then the jury's later instructed legitimate medical purpose is a subjective standard. So in my view, there's only one way the jury could understand Dr. Chaytoff's testimony about legitimate medical purpose, and that is that he's opining, actually, about Dr. Santos's subjective mental state. That's the reasoning. He doesn't come out, like you said, and say, this is Dr. Santos's subjective mental state. But the only way I think the jury could reasonably have understood the testimony, if they're following the instructions, which, of course, we say that they always do, they could have understood it in only one way, and that's about subjective mental state, and that's a violation of Rule 704B. So the plain error standard, this comes up in virtually every criminal case. There's error, there's plain, there's substantial rights, and reputational harm to the tribunal. Let's talk about the first two elements. I don't think there's any dispute, really, that the offering of legal opinions and the offering of subjective mental state, like the major premise just in general, that that's not allowed. That's what the Huff case says about legal opinions. That's what Rule 704B says about state of mind opinions. I've cited other cases that say that's not okay as well. What the government's really arguing is not about that major premise. They're arguing about a minor premise, which is they're asking for a context-specific exception for prosecutions under the Controlled Substances Act. And they cite two cases for that proposition, essentially. They put heavy reliance on two cases. One is the Diaz case from the Ninth Circuit, and then a series of cases that follow Diaz from other circuits, sister circuits. And then the other is this court's unpublished decision in Mencia. I'm sorry, I keep thinking that you want to ask a question, Judge Frank. There's a suggestion, Mr. Burns, in the government's brief. Actually, it's more than a suggestion. That Mr. Santos's, Dr. Santos's counsel sort of asked the defense expert similar questions. And the argument is that it was a legitimate strategic decision to not object when Dr. Chaytoff was being asked similar questions because the defense wanted to get out like testimony from the defense side of things. Can you respond to that? That's quite the inference to be making because remember that Dr. Chaytoff didn't disclose that he was relying on legal authorities to provide his opinion. So like the first time that the defense is hearing this is at trial. So, you know, they're caught off guard a bit. And then it comes up, I believe several days later when they call their defense witness and they go through the defense witness in a different way. They don't say, what does the statute say? What does the regulation say? What does that mean? And what are you basing your opinion in law? They just ask the questions and that doctor is talking about industry custom and practice. So like the same testimony didn't come out on the defense side. It came out in a way that's industry custom. Mr. Burns, when did the judge err? Should the judge have stricken the opinion of the doctor when he uttered it? Yes. On the spot. Exactly. I'm saying that's what I have to prove to you to satisfy the plain error standard. Should have intervened on the spot. Exactly. And not waited for defense counsel. Exactly. The judge should have stopped and said, like, you know, the question is, as soon as the witness starts saying. What's your best case for the proposition that a district judge has to intervene on the spot, sua sponte, when an opinion is uttered by a prosecution expert, which may be inadmissible. I believe that's huff, but on the spot, I don't recall. I'm unaware of any opinion would tell the judge to do that. OK, I think so. So the question becomes, how is it plain? OK, so how's it playing for plain error? When we argue plain error, you say, well, there's an error here and here's precedent, which told the judge what to do. But there isn't any. I believe huff might be, but what I don't it's a preserved error case. I'm talking about a case which says the judge should intervene on the spot. I like I said, I think huff might say that, but I'm not I'm not very confident that that's the right that it actually did. Well, the reason I ask the question, it seems to me like it's common sense that you would wait to hear what defense counsel does. And if defense counsel doesn't move to strike it, defense counsel might have some strategic reason for doing that. For example, setting up his own expert testimony. I understand that point of view. This judge, Judge Scriven, isn't shy about stopping a witness from answering other questions when they go beyond what the questions asked. I'm relying on the general rule that experts can't give legal opinion testimony and then a principle from that. I agree with the general rule, which generally is invoked by objection is all I'm saying. Yes, I do understand that. Yes, I understand the point. Okay. Okay. We've taken you over your time. Yes. I want to give you your time for rebuttal. Thank you. Thank you very much. Now the telephone. Okay. Ms. Gershaw, can you hear us? I can, Your Honors. Can you hear me? Yes. Go right ahead. Okay. Good morning, Your Honors, and may it please the Court. I'm sorry I'm not able to be with you in person today. I would like to start by addressing Dudelaw's sufficiency argument. As much as Dudelaw wants to insist that he isn't challenging the jury's should not have believed witness testimony because it conflicted with video and audio evidence. But the video and audio evidence in this case captures two patient visits on two days. They do not encompass everything that happened at the clinic during the course of Dudelaw's tenure, and they do not capture the visits of the non-undercover patients who testified at trial. Thus, this is not a case where the Court must defer to the videotape instead of the witness's testimony if believed by the jury sufficiently shows that Dudelaw conspired to unlawfully distribute controlled substances. But how? One question, Ms. Gershaw. So I don't know what the ultimate answer is, but this looks like, at least as regards to Dr. Dudelaw, it's a relatively thin case, right? Because of the fact that your expert wasn't able to testify with regards to legitimate medical practices or review of the prescriptions. So how do you go from red flags to showing a knowing and intentional agreement to violate the narcotics laws? This Court has held that expert testimony is not necessary to establish it in all cases, and I would say that this is one of those cases in which it's not necessary. I'm just saying that the absence of expert testimony makes your case thinner. I'm not saying it's dispositive. Yes, Your Honor, I agree with that. But I do think that there is ample evidence in the record from which a jury could find that he knew that he was unlawfully prescribing controlled substances, including the fact that witnesses were coming from as far away as Panama City. They were getting their MRIs in Miami. They were filling their prescriptions in Alabama. They were bringing other patients with them. They were clearly showing signs of addiction, including that they had track marks on their arms. And these weren't patients that he saw one time, like the undercover agent and the C.I. These are patients that he was seeing for years. When these patients are testifying, I looked like death warmed over. I was addicted. He never asked me any questions about how these medications were affecting me. He never discussed alternative treatments with me. Jeremy Walker testified, I have track marks on my arm, but I wore long sleeves. He never asked me to draw my arms. My examinations only last a short time. Most of the time, we were talking about how do you go from how do you go from a showing of I've never had one of these cases myself. So it's a learning experience for me. How do you go from. A showing of what may be considered medical negligence to a showing of a knowing and intentional agreement to violate the narcotics laws. You have to show that there was an agreement to issue controlled substances not for legitimate medical purpose or outside the course of usual practice. And here, this evidence shows both because this court has held that when you prescribe controlled substances to patients who are obviously addicted to controlled substances, such as these patients were, that that is evidence that you are prescribing controlled substances outside the course of professional practice and without a legitimate medical purpose. And I would point the court to the IRL case, which is a pharmacist case that the same principles apply where the court said, look, these patients that the pharmacist prescriptions were filling, those were obviously giving to prescriptions who were showing signs that they were addicted and engaged in drug seeking behavior. And it is not it is not a legitimate medical purpose to prescribe to prescribe controlled substances to patients who are seeking it because they are addicted to the drugs as opposed to to treat their pain. Let me ask you about your discussion in the brief about Mr. Gonzalez, part of Mr. Gonzalez's testimony. I think he testified that he hired Dr. Dildalau because in part because he wanted to have someone who was going to write prescriptions for controlled substances. But you say on page four of your brief that Gonzalez testified that he wanted Dr. Dildalau to treat patients exclusively. Those are your words with narcotics. Did Dr. Did Mr. Gonzalez testify to that, or is that an inference you're drawing from his testimony? I believe it does. I'm sorry. Gonzalez did testify that he wanted someone who was going to exclusively treat with controlled substances because that's what the that's what patients wanted. Now, he discussed that with Dr. Dildalau that he wanted him to exclusively treat patients with narcotic substances. He did not tell Dildalau that he wanted him to treat exclusively with controlled substances. But what he did do is go over the charts of patients who prescribed in the past to make sure he was comfortable doing the thing. And so I'm not saying, and it's not my position, and it's the brief read that way, I apologize, but this is not to say that that Gonzalez said to him, I want you to exclusively treat with controlled substances. But that was Gonzalez's point. And while it's not sufficient to establish a conspiracy, I think it is relevant evidence that there was a conspiracy that in Gonzalez's mind, he was hiring this person because he believed that this person would write prescriptions for exclusively controlled substances, regardless of whether there was a legitimate medical purpose, and without an outside the course of professional practice. And so that is circumstantial evidence, although not dispositive evidence, that, in fact, there was a conspiracy. And that evidence is bolstered by the fact that Dildalau worked there for years, despite all of this evidence that this was a pill mill that Judge Pryor discussed, and that Gonzalez allowed him to stay there and practice, and that those suggest that he was in on this scheme. And so if there aren't any further questions on that, I'd like to transition to Santos's argument. And as an initial matter, Santos is trying to muddy the water by asserting that the expert testing was absurd or incorrect, or that the subject of the testimony was undisclosed. But that's not the issue he raised on appeal. The issue he raised on appeal is that the expert gave impermissible legal conclusions and testified about Santos's state of mind. Focusing on just those arguments, it's clear he has not established his right to relief under plain error review. First, he says that an expert cannot testify that a prescription is not for a legitimate medical purpose or outside the course of professional practice, because those are legal conclusions. But this court has never held that, and in unpublished opinions, has held that these are, in fact, issues of fact. Next, Santos argues that the expert infamously testified as to his state of mind. But as Judge Pryor recognized, the expert never testified that Santos did not believe the prescriptions were not for legitimate medical purposes, and he just testified that the prescriptions were not. You talk in your brief as well, Ms. Gershaw, about what these patients were doing with, some of the patients were doing with the controlled substances after they were given prescriptions. How are we supposed to infer knowledge by Dr. Doldalau or Dr. Santos about those events? Well, with respect to Dr. Santos, in the undercover visit, the CI says that his girlfriend is robbing him of his medication. He says that he's getting medication from friends and family, so that's clear evidence that he is, that both the CI and the undercover are diverting their medications. With respect to Doldalau, there's circumstantial evidence in the fact that, for instance, he knew that Jeremy Walker was coming in groups, which is evidence of sponsoring behavior. But even with Doldalau, even if he didn't know what they were doing with them, again, there were clear signs that these were drug addicts to whom he was prescribing patients. And in addition, there's the evidence that there were patients in the office that were going through withdrawal that were sleepy, that were, again, looked and acted like addicts. And so then, so in Mencia, going back to the expert witness testimony, they said that when talking about somebody prescribing prescriptions for a legitimate medical purpose does not go to their state of mind unless they say specifically that the person knew that they were doing so. Ms. Garcia, would you address Mr. Burns' argument about the district court's jury instruction regarding that it was a subjective inquiry? So the jury instruction is that you have to, in order to find him guilty, you have to find that he subjectively believed that. But obviously, evidence that somebody subjectively believed that something was not for a legitimate medical purpose is actually, was this for a legitimate medical purpose? So that's one step, right? The expert says, in my opinion, these are not for a legitimate medical purpose. But then the jury has to take another step and say, okay, so this expert says that these are not for a legitimate medical purpose. First, do I believe that testimony? And if I do believe that testimony, then second, what evidence establishes the knowledge? And so the jury instruction and the expert testimony, none of that bridges that second element to say that his testimony was going to his state of mind. And again, it's certainly not plain error here because we don't have cases that say this is the opposite. And he also talks about that it's impermissible for him to talk about what the state of Florida law defines. But in Mencia, the expert stated that Florida law defines what is and is not within the scope of professional practice for physician's license in the state. And then based on those laws, he opined that the doctor had acted outside the scope of professional practice by failing to comport with certain requirements. In Mencia, the court held that it is the court's non-fused discretion in making a testimony. It follows, therefore, that the testimony was permissible in this case, and it certainly wasn't impermissible. And I'd also like to point out that these statutes and regulations that he was talking about, those are not instructions of the law in this case. They're not saying, if you find that he violated this Florida statute, you must find him guilty. What he's doing is explaining what the standard of care for doctors is in Florida and explaining which is relevant to whether something is within the course of professional practice. The judge instructed the jury that to prescribe something in the course of professional practice, it's to be judged objectively by reference to the medical practice generally recognized and accepted in the United States, including the state of Florida. And all he was doing is establishing what those practices are, which the court did not define for the jury. And I would imagine that the defendants would not have wanted the judge to instruct the jury on these Florida statutes and what they do and do not require, because that would have been giving legal impetus to what these standards are. So that goes sort of to my last point, which is that even if there had been some sort of error in the testimony, it was not the kind of error that would affect his substantial rights. And the burden is on the defendant to show that, but for these errors, the outcome would be different. And I haven't heard any good explanation about why that would be so, especially given the jury's instruction, the fact that they were told that whether the defendant acted without a legitimate medical purpose depends on the defendant's objective intent. And that's whether the defendants act outside the usual course of professional practice is to be judged objectively by reference to the evidence. So I would imagine that the experts were cross-examined vigorously, that their own expert testified, and the overall evidence is still even without the expert testimony. So if there are no other questions, I would ask the court for these reasons and the reasons they are briefed to affirm the defendant's convictions and sentence. All right. Thank you very much, Ms. Gershow. Mr. Weisbrot. Thank you, Your Honor. Very briefly, regarding the exclusivity comment that both the district court relied upon in her post-trial order denying the motion for judgment of acquittal and also the to Dr. Daldolau, it wasn't in response to a question. It wasn't offered up. It wasn't spontaneous. It's just something that he testified to at trial. So Dr. Daldolau would have to have read Mr. Gonzalez's mind to know this particular fact. But what Mr. Gonzalez is doing is he's going to be running a licensed pain management clinic. He knows he needs a doctor with a DEA license, which gives that doctor the right to issue these sorts of prescriptions. That's taking legal acts and legal facts and creating an inference of participation and illegal conspiracy out of it. And we just think that that's present throughout the entirety of the brief and ought not to be evidence of guilt. And it goes to almost every single one of these red flags, not almost every single one of these red flags, from cash to long distance to patients not coming with their medical records. None of that, none of that is illegal or a violation of any rules, statute, policy guidelines. Counsel, that's the classic circumstantial evidence argument. You pick out this fact or this other fact, this fact, say, well, what does that mean by itself? You don't say it by itself. You have to put them all together. They're like grains of sand and you draw an inference. Sure. But we have desperately tried to show the court that every single fact. There's no doubt that Gonzalez wanted an end result. Do you agree with that? Not the illegal end result. No, sir. He testified under trial that he did. He wanted certain things to be done in his mind. Yes, that's OK. So then he then he then he conducts an interview with somebody and hires them. And so the inference is that the response from from your client satisfied his goal. But I disagree, Your Honor, because you have a licensed physician not only by the state of and you are working in a pain management clinic, which by definition under Florida law says the majority of the patients will receive controlled substance prescriptions, opioid prescriptions. So, again, you're taking these perfectly legal acts that Dr. Bogelow is entitled to perform and his status, which is perfectly legal. And you are glomming that on to supposedly an illegal thought that Mr. Gonzalez has. And you're saying, well, then the two parties are in agreement and we are asking the court not to do that in this case because the evidence doesn't support that agreement. Thank you very much, Mr. Weisbrot. Thank you. Judge Shofrat, my best case is actually Hawkins, not Huff. Huff involved preserved error. Hawkins involves a plain error. It doesn't involve jumping up and stopping legal opinion testimony, but it does involve jumping up and stopping a case agent from opining incorrectly. I'd like to discuss the Mencia decision. There's three responses to that. It's unpublished, it's wrong, and it violates the prior panel precedent rule. That case actually says the witness testified, this is what the law says. And that's what I'm saying has been forbidden for that law. So it's incorrect and in violation of the prior panel precedent rule. The government says that there's no effect on substantial rights. They're taking the position that their star witness discussed extensively in opening statements, closing arguments, and who testified for four days didn't matter. We're saying the opposite. He mattered very much. You make that decision. These weren't off-the-cuff statements. This was like extensive testimony. And then finally, the danger in these pain clinic cases is convicting doctors of mere medical malpractice. I think the government's presentation of Dr. Chaytoff in a kind of clumsy manner made that danger a reality and it deprived them of a fair trial. So we're asking you to vacate the judgment and remand for retrial. All right, thank you all very much. Thank you. Our next case is number 19-13165, Emmanuel Latour versus the Attorney General.